# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **KEISHA PAIGE-HULL, et al.** | § | |
| | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:05-CV-1339-BH** |
| | § | |
| **GLADYS M. WOFFORD** | § | |
| | § | |
| **Defendant.** | § | **Consent Case** |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pursuant to the District Court's *Order of Reassignment*, filed July 1, 2007, and the consent of the parties, this matter has been transferred to the undersigned United States Magistrate Judge for the conduct of all further proceedings and the entry of judgment in accordance with 28 U.S.C. § 636(c). On March 31 through April 2, 2008, and on May 14, 2008, the Court conducted a bench trial. After consideration of the testimony and evidence presented during the trial, the parties' post-trial proposed findings of fact and conclusions of law, the arguments of counsel, and the relevant authorities, the Court finds and concludes as set forth below.

## I. BACKGROUND

This case arises from an interpleader action filed by The Metropolitan Life Insurance Company ("MetLife") after conflicting claims were made to life insurance proceeds payable from the Southwestern Bell Communications ("SBC") Medical and Group Life Insurance Plan and the SBC Supplementary Group Life Insurance Program (collectively, the "Life Insurance Plan"). The Metropolitan Life Insurance Company ("MetLife") is the claims fiduciary for the Life Insurance Plan. Also at issue are pension benefits payable from the SBC Pension Benefit Plan - Bargained

Program and the SBC Payroll Based Stock Ownership (collectively, the "Pension Plan"). The Life Insurance and Pension Plans are governed by the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001, *et seq.* ("ERISA").

Dwight W. Clewis ("Mr. Clewis"), an employee of SBC for approximately 30 years, participated in the Life Insurance Plan and was enrolled for $43,000 in basic life insurance coverage and $172,000 in supplemental life insurance coverage. At the time of his death on November 4, 2004, Mr. Clewis was also entitled to benefits and stock in the amount of $104,656.07 from the Pension Plan. Shortly after Mr. Clewis's death, his sister and his children made conflicting claims of entitlement to the proceeds of the Life Insurance and Pension Plans.

On March 27 and July 6, 2006, the District Court granted MetLife and the intervenor Pension Plan's motions for authorizing deposit of funds and dismissed MetLife and the intervenor Pension Plan from the action. (Dockets #48, 56). After realignment and consent of the remaining parties, remaining for trial is the beneficiary of the $319,656.07 in proceeds, plus interest, from the Mr. Clewis's Life Insurance and Pension Plans. The plaintiffs are Mr. Clewis' children, David Clewis, Daryle Clewis, Keisha Paige-Hull,[1] Dwight R.W. Clewis, and Bryson Pettigrew (collectively, "Plaintiffs"). They allege that Mr. Clewis did not sign the form designating Mr. Clewis's sister, Defendant Gladys Wofford ("Defendant"), as the sole beneficiary of the proceeds from the Life Insurance and Pension Plans. In the alternative, Plaintiffs allege that the naming of Defendant on the beneficiary designation form was the result of fraud. Plaintiffs also allege in the alternative that if Mr. Clewis did sign the beneficiary designation form, he lacked the mental capacity to do so. Finally, Plaintiffs allege in the alternative that if Mr. Clewis signed the beneficiary designation form

---

[1] The Court assumes, without deciding, for purposes of this opinion that Plaintiff Keisha Paige-Hull is the daughter of Mr. Clewis.

with the proper mental capacity, he did so under undue influence, duress, or coercion by Defendant.

(*Joint Pretrial Order*, docket #187).

## II. FINDINGS OF FACT[2]

1.    Mr. Clewis had a life insurance policy from SBC, his employer for almost thirty years, but he never designated a beneficiary during that time. (Tr. Vol. 4 at 141:16 to 141:23).

2.    During a hospitalization at Mesquite Medical Center ("Mesquite") in August of 2004, Mr. Clewis discussed the life insurance beneficiary designation form with Mr. Raymond Fuller, his best friend of 30 years. The two men discussed the forms, went over the instructions, and reviewed each section. Mr. Clewis did not complete the beneficiary designation form at this time. (Tr. Vol. 4 156:15 to 157:9).

3.    On October 7, 2004, Dwight W. Clewis entered Mesquite for the third time in three months. His sister, Defendant Gladys Wofford, was with him on this date. The examining doctor, Dr. Jafarian, noted that Mr. Clewis was alert and oriented to person, place, and time. Mr. Clewis was admitted to Mesquite and remained there until October 20, 2004. (Ex. 15 at 180; Ex. 17 at 7, 59).

4.    Dr. Jafarian kept Defendant informed of Mr. Clewis's status throughout the time he was hospitalized in Mesquite. (Ex. 17 at 7).

5.    Nurses at Mesquite noted Mr. Clewis's neurological and psychological status twice daily. The nurses noted that Mr. Clewis was alert and oriented to person, place, and time (A&Ox3) for each observation period from October 7 to October 20. (Ex. 15 at 609, 612, 615, 618, 621, 624, 627, 630, 633, 636, 639, 642, 645, 648). The nurses made this determination by engaging in conversation and asking questions. (Tr. Vol. 3 at 69:16 to 69:22).

6.    When documenting a patient's condition in medical records, it is the general practice of medical professionals to note only abnormal conditions; no notation is often made when a condition is normal. (Tr. Vol. 3, 140:20 to 141:12).

7.    Mr. Clewis received between zero and four 2 milligram doses and between zero and five 4 milligram doses per day of morphine sulphate (an opioid analgesic) while at Mesquite. (Ex. 17 at 97, 103, 108, 113, 120, 125, 131, 137, 142, 147, 151, 155, 159).

8.    No physician or nurse noted a problem with Mr. Clewis's cognitive ability at any point during his stay at Mesquite.

---

[2] "Ex." designates the corresponding joint trial exhibits and page number. "Tr." designates the four-volume transcript of the March 31 through April 2 and May 14, 2008 proceedings before the Court, which was filed on July 21, 2008.

9.	On October 20, Mr. Clewis was discharged from Mesquite and transferred to Presbyterian Hospital of Dallas ("Presbyterian"). Dr. Peter Loeb, a gastrointestinal specialist, assumed care and noted that Mr. Clewis was alert and oriented to person, place, and time. (Ex. 16 at 284; Ex. 17 at 5).

10.	While at Presbyterian, nurses assessed Mr. Clewis's neuromuscular and psychosocial state several times each day.

11.	The standard parameters for the neuromuscular assessment included alert and oriented; no pain; active movement of all extremities with apparent symmetry and strength; no altered sensation; and cognitively intact. The nurses at Presbyterian noted an exception to the standard parameters and included the notation of "general weakness" on each day from October 20 through October 26. They did not comment on Mr. Clewis's cognitive abilities. (Ex. 16 at 346, 352, 356, 363, 368, 373, 378).

12.	The standard parameters for the psychosocial assessment included appearance, behavior, thought process, mood and verbalization appropriate to situations; short term memory intact; supportive home life; and sleep patterns normal for patient. The nurses at Presbyterian noted that Mr. Clewis met the standard on each day from October 20 through October 26. (Ex. 16 at 346, 352, 356, 363, 368, 373, 378).

13.	From October 20 to October 28, medical staff at Presbyterian provided Mr. Clewis with verbal explanations and paper handouts on topics related to his medical care. The medical staff noted that Mr. Clewis possessed no learning barrier and voiced understanding of the information provided, although he occasionally needed reinforcement. (Ex. 16 at 385).

14.	While at Presbyterian, Mr. Clewis received intravenous patient-controlled analgesia (PCA) of morphine at a concentration of one milligram per milliliter. The maximum dose he could have received was one milligram every 10 minutes, with a maximum of twenty milligrams within a 4-hour period. (Ex. 16 at 244; Tr. Vol. 3 at 62:12 to 63:15).

15.	Mr. Clewis never dispensed more than 50 milligrams of his 120 milligram daily maximum during his stay at Presbyterian. (Ex. 16 at 396-403, 480, 482).

16.	On October 21, Dr. G. Thomas Shires, III conducted a consultative exam and noted that Mr. Clewis was alert and oriented. (Ex. 16 at 185).

17.	On October 26, Dr. Loeb informed Mr. Clewis of his diagnosis of pancreatic cancer. (Ex. 16 at 259).

18.	On October 27, at 8:15 A.M., the medical record noted that Mr. Clewis was in no apparent distress ("NAD") and that he was alert and oriented to person, place, and time (A&Ox3). (Ex. 16 at 259).

19. On October 27, Dr. Lalan S. Wilfong, conducted a consultative examination. He noted that Mr. Clewis was depressed over his recent diagnosis. There was no notation to suggest that Mr. Clewis was disoriented, confused, or unable to process information. Dr. Wilfong also prescribed a fentanyl 50 microgram patch to alleviate Mr. Clewis's significant pain. Defendant was present and participated in the consultation, and Dr. Wilfong referred to her as Mr. Clewis's primary care giver. (Ex. 16 at 180-83).

20. On October 28 at 8:00 A.M., the medical record noted that Mr. Clewis was in no apparent distress and that he was alert and oriented to person, place, and time. (Ex. 16 at 255). Between 1:25 and 1:50 P.M., an occupational therapist noted that Mr. Clewis's cognition was alert and intact. (Ex. 16 at 408).

21. On October 28 at 9:00 A.M., Mr. Clewis began to receive 20 milligrams per milliliter of Roxanal (morphine sulphate) for pain. He received this dose every four hours until 5:00 A.M. on October 29. One of the doses he received was administered at 5:00 P.M. on October 28. (Ex. 16 at 301-02).

22. Mr. Clewis enrolled in hospice care on October 28. (Ex. 18 at 556). Sometime between 3:30 and 5:11 P.M., Nancy Delagarza, a hospice worker, visited Mr. Clewis to complete the necessary paperwork. She noted that Mr. Clewis's level of consciousness was alert and oriented. (Ex. 18 at 506; *see* Tr. Vol. 3 at 49:03 to 51:11).

23. When Mr. Fuller visited Mr. Clewis in the afternoon of October 28, Mr. Clewis told Mr. Fuller that he "was ready to fill the [life insurance beneficiary designation] form out and he wanted Gladys and his mother to get everything. He wanted Gladys to be the beneficiary because he knew that she would take care of their mother." (Tr. Vol. 4 at 168:5 to 168:8). Defendant was at the hospital but not in the room at this time. (Tr. Vol. 4 at 168:18 to 168:19).

24. When Defendant returned to the room, Mr. Clewis told her how he wanted the beneficiary designation form filled out and asked her to write the information in the appropriate sections. This was the first time Defendant learned she was the designated beneficiary. (Tr. Vol. 4 at 170:9 to 171:4).

25. At approximately 6:30 P.M. on October 28, Mr. Fuller saw Mr. Clewis sign the five-page beneficiary designation form. (Tr. Vol. 4 at 176:8; *see* Tr. Vol. 1 at 136:8 to 136:12).

26. The beneficiary designation form applied to all programs in which Mr. Clewis participated, which included the Life Insurance and Pension Plans. The primary beneficiary, with a 100% share, was Defendant. Mr. Fuller signed the beneficiary designation form as a witness. (Ex. 1).

27. Mr. Clewis and Mr. Foster signed the beneficiary designation form in the presence of Ms.

Jeannine Foster, a notary public.  (Tr. Vol. 4 at 176:15; Tr. Vol. 1 at 141:10 to 142:12).

28.  Mr. Clewis knew what the beneficiary designation form was when he signed it.  (Tr. Vol. 4 at 178:1 to 178:7).

29.  Ms. Foster signed and notarized the beneficiary designation form but did not record the transaction in her record book.  (Ex. 1 at 5; Tr. Vol. 1 at 148:8 to 148:21).  At the time of her notarization, Ms. Foster believed she was notarizing a two-page power of attorney.  (Ex. 12, ¶¶5, 12; Tr. Vol. 1 at 140:1, 148:1).  Ms. Foster did not discuss the contents of the document she notarized with Mr. Clewis other than to ask if he knew what he was signing.  (Tr. Vol. 1 at 145:15 to 146:9).

30.  Under the SBC rules for beneficiary designations, a beneficiary designation must be made on the form provided by the program administers.  The employee must sign and date the form.  An adult witness who is not the designated beneficiary must sign the form.  (Ex. 2 at § 2.1).  Mr. Clewis completed the beneficiary designation form in accordance with these rules.

31.  On October 29, the medical record noted that Mr. Clewis was in no apparent distress and that he was alert and oriented to person, place, and time.  (Ex. 16 at 439; Ex. 18 at 512).

32.  On October 30 at 9:00 A.M., the medical record noted that Mr. Clewis was in no apparent distress but that he was somnolent.  (Ex. 16 at 438).  A hospice note from the same day notes that Mr. Clewis was confused, forgetful, and lethargic.  (Ex. 18 at 553).

33.  On October 31, the medical record noted that Mr. Clewis was forgetful but alert and that Defendant was "very supportive."  (Ex. 18 at 549-50).

34.  Mr. Clewis was discharged from Presbyterian on October 31 and entered hospice care at Defendant's home.  The hospice worker noted that Defendant was "very supportive" and spoke with her at "great length" regarding Mr. Clewis's prognosis and care as well as hospice services.  (Ex. 16 at 420; Ex. 18 at 549-51).

35.  MetLife received the beneficiary designation form on November 2, 2004.  (*See* Ex. 1).

36.  Decedent died on November 4, 2004, at Defendant's home.  (Ex. 18 at 527-28).

## III.  CONCLUSIONS OF LAW

### A.  <u>Valid Signature</u>

Plaintiffs first contend that Mr. Clewis did not sign the form designating Defendant as the

sole beneficiary of the proceeds from the Life Insurance and Pension Plans.  Although Plaintiffs

raised this issue in the Joint Pretrial Order, none of the Plaintiffs addressed this issue in their post-trial briefs. (*See* dockets #197, 198).

Plaintiffs presented no evidence in support of their contention. To the contrary, Mr. Fuller testified that he saw Mr. Clewis sign the beneficiary designation form. (Findings of Fact, ¶25). Moreover, Mr. Clewis signed the form in the presence of Ms. Foster, a notary public. (Findings of Fact, ¶27). Although Ms. Foster testified that she believed she notarized a two-page power of attorney and not a five-page beneficiary designation form, she does not dispute that Mr. Clewis signed the document in her presence.[3] The Court therefore finds that Mr. Clewis signed the beneficiary designation form on October 28, 2004.

## B.   <u>Fraud</u>

Plaintiffs' second allegation is that the naming of Defendant on the beneficiary designation form was the result of fraud.

To establish fraud, the plaintiff must prove that (1) the defendant made a material representation; (2) the representation was false, (3) the defendant knew the representation was false; (4) the representation was made with the intent of being acted upon; (5) the plaintiff acted in reliance on the representation, and (6) the plaintiff was injured by his reliance. *Oilwell Division, United States Steel Corp. v. Fryer*, 493 S.W.2d 487, 491 (Tex. 1973); *De Santis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex. 1990). The plaintiff has the burden to prove the elements of fraud by a

---

[3] Ms. Foster's failure to record the notarization in her record book as required by statute does not in any way affect the validity of the beneficiary designation. *Hunter v. Struggs*, 352 S.W.2d 289, 290 (Tex.Civ.App. – Houston, 1961, writ ref'd n.r.e.); *Martin v. Bane*, 450 S.W.2d 142, 144 (Tex.Civ.App. – Dallas 1969, no writ); *see* Tex. Gov't Code § 406.014(a) (Vernon 2007) (requirement of notary public to keep a record book of notarized instruments).

preponderance of the evidence. *Citizen Standard Life Ins. Co. v. Gilley*, 521 S.W.2d 354, 356 (Tex.Civ.App. – Dallas 1975, no writ).

Plaintiffs' argument for fraud relies solely upon Ms. Foster's testimony that she believed she notarized a two-page power of attorney on October 28, and not a five-page beneficiary designation form. (Docket #197 at 5, ¶¶21-25). Essentially, Plaintiffs argue that Defendant made a material misrepresentation to both Mr. Clewis and the notary by omitting three pages from the beneficiary designation form and presenting it as a two-page power of attorney. Mr. Fuller, however, testified that he and Mr. Clewis discussed the beneficiary designation form twice prior to the arrival of the notary. (Findings of Fact, ¶¶2, 23). Mr. Fuller also testified that he saw Mr. Clewis sign a five-page document. (Findings of Fact, ¶25). This document reflects Mr. Clewis's wishes that his sister be the sole beneficiary so that she can take care of their mother. As the trier of fact, the Court finds that Mr. Fuller's testimony more accurately reflects what occurred when Mr. Clewis signed the documents presented to the notary. Plaintiffs therefore have not met their burden to show by a preponderance of the evidence that Defendant made a material misrepresentation. Since they failed to prove the first element of fraud, the Court need not consider the remaining factors.

## C.     Mental Capacity

Plaintiffs next contend that Mr. Clewis lacked the mental capacity to sign the beneficiary designation form.

Insurance policies are contractual agreements and are governed by the general rules of interpretation applicable to contract law. *American Standard Life Ins. Co. v. Redford*, 337 S.W.2d 230, 231 (Tex.Civ.App. – Austin 1960, writ ref'd n.r.e.). Included in those general rules is the presumption of mental competency to enter into a contractual agreement. *Denny v. Stokes*, 72 S.W.

209, 211 (Tex.Civ.App. – Houston 1903, no writ); *Swink v. City of Dallas*, 36 S.W.2d 222, 224 (Tex.Comm'n App. 1931, holding approved). A presumption therefore exists that the decedent possessed the requisite mental capacity to make his designation. *Hall v. Hall*, 352 S.W.2d 765, 765 (Tex.Civ.App. – Houston 1962, no writ). To overcome this legal presumption, the burden of proof rests upon the party asserting to the contrary to establish by a preponderance of the evidence that the decedent lacked the mental capacity to make his designation. *Swink*, 36 S.W.2d at 224.

The standard for determining the existence of mental capacity to execute a document is whether the person signing it appreciated the effect of what he was doing and understood the nature and consequences of his acts and the business he was transacting. *See Mandell & Wright v. Thomas*, 441 S.W.2d 841, 845 (Tex. 1969) (will); *Bach v. Hudson*, 596 S.W.2d 673, 675-76 (Tex.Civ.App. – Corpus Christi 1980, no writ) (contract). Mental capacity may be evidenced circumstantially by evidence of (1) a person's outward conduct, manifesting an inward condition; (2) preexisting external circumstances tending to produce a special mental condition; and (3) prior or subsequent existence of a mental condition from which its existence at the time in question may be inferred. *Bach*, 596 S.W.2d at 676. The pivotal issue is whether the decedent had the requisite mental capacity on the day the document was executed. *Lee v. Lee*, 424 S.W.2d 609, 611 (Tex. 1968). However, evidence of the decedent's state of mind at other times can be used to prove his state of mind on the day the document was executed provided the evidence demonstrates a condition affecting his mental capacity was persistent and likely present at the time the document was executed. *Croucher v. Croucher*, 660 S.W.2d 55, 57 (Tex. 1983). Evidence that creates only a suspicion of mental incapacity is not sufficient to support a finding of lack of mental capacity. *See Horton v. Horton*, 965 S.W.2d 78, 85 (Tex.App. – Fort Worth 1998, no pet.).

In this case, Plaintiffs raise two arguments in support of their contention that Mr. Clewis lacked the necessary mental capacity at the time he designated Defendant as the sole beneficiary of his Life Insurance and Pension Plans. They first assert that Mr. Clewis did not discuss the effects of signing the beneficiary designation form with Ms. Foster before he signed it. (Docket #197 at 4, ¶23). Plaintiffs fail to cite to any case law or statute in support of the contention that the failure to discuss the effect of an instrument with a notary public is indicative of lack of mental capacity. Moreover, conversations Mr. Clewis had with Mr. Fuller, his best friend of 30 years, on at least two occasions indicated that he appreciated the effect of what he was doing and understood the nature and consequences of signing the beneficiary designation form. The first conversation occurred when he was hospitalized in Mesquite in August of 2004 when the two men discussed the beneficiary designation form at length. (Findings of Fact, ¶2). The second conversation occurred on October 28, the day he signed the form. Mr. Clewis told Mr. Fuller that he wanted Defendant, his sister, to get "everything" because he knew she would take care of their mother. (Findings of Fact, ¶23). These conversations indicate that Mr. Clewis possessed the necessary mental capacity when he signed the beneficiary designation form. *See Mandell*, 441 S.W.2d at 845.

The second argument Plaintiffs raise regarding Mr. Clewis's mental capacity is that he received narcotic pain killers and that these medications made him drowsy. (Docket #197 at 4-5, ¶¶24, 25, 26). Plaintiff received several prescription narcotic medications over the course of his month-long hospitalization in Mesquite and Presbyterian. (Findings of Fact, ¶¶7, 14, 19, 21). Even though he received several medications to control his pain, no nurse or physician noted a problem with Mr. Clewis's cognitive ability at either hsospital. (Findings of Fact, ¶¶8, 11, 12). The nurses at Presbyterian noted general neuromuscular weakness but did not comment on his cognitive

abilities; under the standard medical practice, the failure to comment means these faculties were normal. (Findings of Fact, ¶¶6, 11). Importantly, a few hours before he signed the beneficiary designation form, Nancy Delagarza, the hospice worker, noted that Mr. Clewis was alert and oriented. (Findings of Fact, ¶22). Viewing these facts as they pertain to mental capacity, Plaintiffs failed to meet their burden to show by a preponderance of the evidence that Mr. Clewis lacked the requisite mental capacity when he signed the beneficiary designation form or in the weeks leading up to that date. *Swink*, 36 S.W.2d at 224 (burden); *Lee*, 424 S.W.2d at 611 (day of designation); *Croucher*, 660 S.W.2d at 57 (other times surrounding designation). At most, Plaintiffs' argument of a drug-induced haze only introduced a remote suspicion of mental incapacity, which is not sufficient to support a finding of lack of mental capacity. *See Horton*, 965 S.W.2d at 85. The Court finds that Mr. Clewis possessed the requisite mental capacity when he signed the beneficiary designation form on October 28, 2004.

**D.** **Undue Influence**

In the alternative, Plaintiffs argue that Defendant exerted undue influence over Mr. Clewis when he signed the beneficiary designation form.

While mental incapacity implies the want of intelligent mental power, undue influence implies the existence of a mental capacity subjected to and controlled by a dominant influence or power. *Rothermel v. Duncan*, 369 S.W.2d 917, 922 (Tex. 1963); *Long v. Long*, 196 S.W.3d 460, 466-67 (Tex. App. – Dallas 2006, no pet.). The legal standard guiding determination of the existence of undue influence applies substantially alike to wills, deeds, and other instruments. *Rankin v. Rankin*, 151 S.W. 527, 529 (Tex. 1912); *DeGrassi v. DeGrassi*, 533 S.W.2d 81, 85 (Tex.Civ.App. – Amarillo 1976, writ ref'd n.r.e.). At trial, the party wanting to set aside a document

on the basis of undue influence must prove: (1) the existence and exertion of an influence; (2) that operates to subvert or overpower the person's mind when executing the document; and (3) that the person would not have executed the document but for the influence. *Rothermel*, 369 S.W.2d at 922. The contestant must prove these elements by a preponderance of the evidence using either direct or circumstantial evidence. *In re Wood's Estate*, 542 S.W.2d 845, 847 (Tex. 1976); *Rothermel*, 369 S.W.2d at 922. When circumstantial evidence is relied upon, the circumstances must be so strong and convincing and of such probative force as to lead a well-guarded mind to a reasonable conclusion not only that undue influence was exercised but also that it controlled the willpower of the testator at the precise time the will was executed. *Estate of Davis v. Cook*, 9 S.W.3d 288, 293 (Tex.App. – San Antonio 1999, no pet'n).

In this case, Plaintiffs' argument of undue influence rests upon Defendant's nearly constant presence at Mr. Clewis's side during the last month of his life. (*See* Docket #198 at 4-5, ¶¶18-25). To determine whether this satisfies the first element of undue influence, the Court focuses upon the relationship between the person who executed the document, the contestant, and the party accused of exerting undue influence. *Rothermel*, 369 S.W.2d at 923. Defendant was Mr. Clewis's sister, who was referred to by at least one doctor as Mr. Clewis's primary care giver. (Findings of Fact, ¶19). Defendant was with Mr. Clewis when he entered Mesquite in early October, and doctors at both Mesquite and Presbyterian kept her abreast of his developments. (Findings of Fact, ¶¶3, 4, 19, 34). When Mr. Clewis transferred into hospice, he spent his remaining days at Defendant's home, during which hospice workers noted Defendant was "very supportive." (Findings of Fact, ¶¶33, 34, 36).

In assessing the first element of undue influence, the Court also examines the "opportunities existing to exert the influence, the circumstances surrounding the execution of the document, the existence of any fraudulent motive, and whether the testator was habitually subjected to the control of the party accused." *Estate of Davis*, 920 S.W.2d 463, 466 (Tex.App. – Amarillo 1995, writ denied). While Defendant's constant presence may have presented an opportunity to exert undue influence with regards to the beneficiary designation, the circumstances surrounding the execution do not show that she in fact exerted such an influence. Plaintiffs presented no evidence that Defendant ever initiated a conversation about the Life Insurance or Pension Plans with Mr. Clewis. In fact, the record shows that Mr. Clewis only discussed his wishes with Mr. Fuller and that Defendant was not in the room when these conversations took place. (Findings of Fact, ¶¶2, 23, 24). Additionally, Defendant did not learn that she was the named beneficiary until a few hours before Mr. Clewis signed the form. (Findings of Fact, ¶24). The fact that Defendant completed the form per Mr. Clewis's instructions is not demonstrative of undue influence, especially since Mr. Fuller was in the room at the time she completed the forms and testified that the designation reflects the wishes of the decedent. Finally, there is no evidence of the existence of a fraudulent motive, and based on the evidence, the Court finds that Mr. Clewis was not habitually subject to Defendant's control. Considering these factors, the Court finds that Plaintiffs failed to prove the first element of the existence and exertion of an undue influence by a preponderance of the evidence. *Rothermel*, 369 S.W.2d at 922.

In addition, the Plaintiffs presented no evidence of the second and third elements of undue influence, i.e., that Defendant subverted or overpowered Mr. Clewis's mind and that he would not have executed the document but for the influence. *Rothermel*, 369 S.W.2d at 922. According to Mr.

Fuller's testimony, Mr. Clewis's wanted Defendant to be the beneficiary to ensure that their mother would be taken care of. Plaintiffs have not shown that Mr. Clewis would not have executed the beneficiary form as he did but for Defendant's influence.

In conclusion, Plaintiffs presented no direct evidence of undue influence, and the circumstantial evidence they rely upon to support their theory is weak and not probative of undue influence.[4] *Estate of Davis*, 9 S.W.3d at 293.

## E.    **Duress and Coercion**

Related to Plaintiffs' allegation of undue influence are their claims of duress and coercion. Plaintiffs, however, do not address duress and coercion separately in their post-trial briefs, but rather, assert them along with their allegation of undue influence. (*See* dockets #197, 198). Indeed, all cases cited by Plaintiffs address undue influence rather than duress and coercion.

"Generally speaking, any coercion of another, either mental, physical or otherwise, causing him to act contrary to his own free will or submit to a situation or a condition against his own volition or interest, constitutes duress." *Pierce v. Haverlah's Estate*, 428 S.W.2d 422, 425 (Tex.Civ.App. – Tyler 1968, writ ref'd n.r.e.). Undue influence and duress are closely related species of legal fraud, but they are not synonymous. *Lawler v. Speaker*, 446 S.W.2d 888, 890 (Tex.Civ.App. – Amarillo 1969, writ ref'd n.r.e.). The real distinction between the two equitable doctrines is the manner or method of overcoming the free will; duress involves unlawful threats or coercion and is an extreme form of undue influence. *Id*. at 890, 892. As a matter of law, there can be no duress unless: (1) there is a threat to do something that a party threatening has no legal right

---

[4]  To the extent that Plaintiffs allege fraud in the inducement to invalidate the beneficiary designation, fraud in the inducement and undue influence are treated as one. *Curry v. Curry*, 270 S.W.2d 208, 214 (Tex. 1954). For the reasons set forth in this section on undue influence, Plaintiffs have not proven fraud in the inducement by a preponderance of the evidence.

to do, (2) there is some illegal exaction or some fraud or deception, and (3) the restraint is imminent and such as to destroy free agency without present means of protection. *Brown v. Cain Chem., Inc.*, 837 S.W.2d 239, 244 (Tex.App. – Houston [1st Dist.] 1992, writ denied); *Simpson v. MBank Dallas*, 724 S.W.2d 102, 109 (Tex.App. – Dallas 1987, writ ref'd n.r.e.). Plaintiffs presented no evidence that Defendant threatened or coerced Mr. Clewis into designating her as the beneficiary of his Life Insurance and Pension Plans. The Court therefore finds that Plaintiffs have not met their burden to show that Mr. Clewis signed the beneficiary designation form under duress or coercion. *See id.*

## IV. CONCLUSION

For the foregoing reasons, the Court finds that Plaintiffs did not meet their burden to show that Mr. Clewis did not sign the beneficiary designation form; that the signature was the result of fraud; that Mr. Clewis lacked the requisite mental capacity; or that he signed the form under undue influence, duress, or coercion. Defendant, as the sole beneficiary, is therefore entitled to 100% of the Life Insurance and Pension Plans.

**SO ORDERED** on this 17th day of September, 2008.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE